*Law Office of*
*Francisco E. Celedonio, Esq.*
*401 Broadway, 25th Fl.*
*New York, New York 10013*

*(212) 219-7533*                                                                                     *Fax (212) 219-4094*

December 9, 2007

*VIA ECF AND BY HAND DELIVERY*
Honorable Douglas F. Eaton
United States Magistrate Judge
United States District Court
500 Pearl Street
New York, NY 11007

Re: *United States v. Jisel Cordero,*
*07 Mag. 694*

Dear Judge Eaton:

This letter is submitted in connection with the sentencing of Ms. Jisel Cordero, scheduled for December 13, 2007, at 3pm.  Ms. Cordero pled guilty pursuant to a misdemeanor information, charging the theft of an amount less than $1,000 from an account at Citibank, N.A.  In light of the applicable advisory sentencing Guidelines (6-12 months), this submission seeks the Court sentence Ms. Cordero to a term of Probation.  Such an exercise of discretion would be appropriate under the mandate of the Guidelines, as well as in the exercise of this Court's discretion, pursuant to 18 U.S.C. § 3553(a).

**I       INTRODUCTION**

On September 5, 2007 Ms. Jisel Cordero pled guilty before this Court pursuant to a plea agreement.  The plea agreement does not provide a calculation or stipulation of the applicable advisory Guidelines, but notes the

maximum statutory term of imprisonment for a misdemeanor is one year, and that the loss amount attributable to Ms. Cordero's conduct is less than $1,000.

The United States Department of Probation for the Southern District of New York ("Probation") has submitted a Pre-Sentence Investigation report ("PSI") dated November 2, 2007. Probation provided the following calculation under the United States Sentencing Guidelines (hereinafter "Guidelines" or "U.S.S.G."): (i) a base offense level of 6; (ii) a 6-level increase because the total intended loss was $60,000; and (ii) a 2-level downward adjustment for acceptance of responsibility, arriving at an adjusted offense level of 10. In Criminal History Category I, offense level 10 (in Zone B) yields an advisory Guidelines sentencing range of 6-12 months incarceration. Probation notes that in Zone B of the Guidelines the Court has various options for imposition of a non-jail sentence. Ultimately Probation recommended a sentence consistent with that sought herein: a three (3) year period of probation with a special condition of home confinement.

Given all the background facts and circumstances of the offense, as well as the history and characteristics presented by this particular defendant – including a complete paucity of any prior entanglements in the criminal justice system, her history of employment, her limited participation and knowledge of any check deposits or withdrawals into the accounts, the policy goals embodied in the Sentencing Reform Act, Ms. Cordero's family circumstances (most notably her two infant children), and the sentencing alternatives available to this Court – we respectfully submit that there is more than a sufficient factual basis supporting Probation's recommendation and ask that the Court follow the recommendation.

**II    THE CHARGED OFFENSE**

*A.    The Scope of the Underlying Criminal Activity*

In early September 2006 Jisel Cordero was approached by a man named "Anthony" LNU who asked that she opened an account at Citibank and provide him the relevant account information. In exchange for opening the

2

account Anthony promised to pay Ms. Cordero $1,000 – ultimately she received $500. Ms. Cordero had never engaged in any prior dealings with Anthony LNU, she was unaware of the manner in which that Anthony would defraud Citibank, or the extent of his activities. Further, she did not participate in any other concerted action with Anthony – except introduce her boyfriend and co-defendant, Jason Cardenes, who also opened an account for Anthony.

We take issue with the loss amount endorsed by Probation ($60,000) for the following reasons: (i) Ms. Cordero's participation in the fraud was limited to opening a single account (with her personal information) and providing the account information to Anthony LNU, for which she was paid $500; (ii) Ms. Cordero did not provide Anthony LNU any checks for the account (this is important, inasmuch as checks were the means used by Anthony to perpetuate the fraud); (iii) Ms. Cordero was completely unaware (and therefore could not agree to) of the dynamics of the scheme, the manner in which monies were siphoned from the Citibank account, the amounts of monies that were (or could be) negotiated through the scheme, or if and when the scheme was in operation; and (iv) in October 2006, prior to being contacted by law enforcement, Ms. Cordero sought to close the accounts by contacting Citibank directly.

Based on my conversations with AUSA Randall Jackson, it is undisputed that Ms. Cordero never entered into any agreement with Anthony, and that she had no knowledge of what Anthony LNU was engaged in after she provided the account information. The PSI provides no information suggesting that any of the checks presented in the scheme were provided by Ms. Cordero. Importantly, Probation does admit that "of the checks deposited in Cardenes' and Cordero's accounts, the intended loss amounts totaled $7,000 and $5,000, respectively." See PSI at ¶ 16.

Thus, unbeknownst to Ms. Cordero, Anthony operated the scheme by depositing checks (from accounts without funds) into the Cordero and Cardenes accounts and withdrawing funds. See PSI at ¶ 8.

In late 2006 – and before she or Cardenes were arrested – Ms. Cordero was contacted and volunteered to meet (without counsel) with United States Postal Inspectors investigating the scheme on at least three occasions. During these meetings Cordero disclosed her dealings with Anthony LNU and provided documents in her possession relating to the Citibank accounts. *See* PSI at ¶¶ 14, 22. Both Ms. Cordero and Mr. Cardenes surrendered to the authorities on May 7, 2007. *See* PSI ¶ 15.

### III   JISEL CORDERO'S PERSONAL AND FAMILY HISTORY

   *A.   Family and Community Ties*

Jisel Cordero is a twenty-five year old Hispanic mother with two daughters (ages 1 and 7) who until November 2007 she was pregnant with her third child; Ms. Cordero suffered a miscarriage as a result of an atopic pregnancy.

Jisel Cordero has been a life-long resident of the Bronx, who left her family home at the age of 14, *see* PSI ¶ 39, started working as a store clerk, *see* PSI ¶ 39, and at age 17, she was pregnant with her first child (Madison Nancy Carrillo, age 7). Since leaving her family Jisel Cordero has dropped out of high school, lived in a series of rented rooms, given birth to two children, lived with the grandmother to one of her children, *see* PSI ¶ 44, and now is in what appears to be a committed relationship with Jason Cardenes who is the father of her second child, Olivia Marie, age 1.

Despite the obvious struggles that have confronted this young woman, Jisel Cordero continues to persevere seeking to provide for her young children, in the hopes they will avoid the pitfalls that have marked her own life to date.

   *B.   Educational History*

After dropping out of South Bronx High School in the eleventh grade due to her pregnancy, Jisel Cordero received a GED from the New York State Education Department on February 10, 2003. *See* PSI p. 10.

4

### C. *Employment History*

Despite the lack of educational opportunities or formal training, Jisel Cordero has a documented history of employment over the last ten years. Beginning in 1996-1999, and again in 2001, Ms. Cordero was employed as a clerk at the retail store, Dr. Jay's, in the Bronx; from 2000-2001 at Spartan Security in Manhattan; at the Wildlife Conservation Society at the Bronx Zoo from 2001-2003 as a supervisor; at Fairway Supermarket in Manhattan between October 2005 and January 2006; and at Glen Island Care Center, a nursing home, from January 2006-April 2006. *See* PSI ¶ 52-57. Although unemployed for much of 2006, since September 2007 Ms. Cordero has gained employment, caring for two children, ages 8 and 13, through the New York City Administration for Children's Services, Division of Child Care. *See* PSI at ¶10.

### D. *Substance Abuse History*

Jisel Cordero has no history of substance abuse.

### E. *Prior Criminal History*

Jisel Cordero has no prior criminal history.

## IV   APPLICABLE LEGAL PRINCIPLES

### A.   *The Sentencing Reform Act in Light of Booker/Fanfan*

We will assume the Court is amply familiar with its sentencing discretion in the wake of the Supreme Court's decision in *Booker/Fanfan* or the Second Circuit's decision in *United States v. Crosby*, 307 F.3d 103 (2d Cir. 2005). Nevertheless, we think it is important to attempt to provide the Court some guidance from the defense perspective.

Prior to *Booker/Fanfan* this Court was constrained in its analysis and sentencing discretion under the unyielding directive of § 3553(b)(1), and the dictates of the Guidelines. Thus, although 3553(a) speaks to considering the

5

"history and characteristics" of the defendant, under the Guidelines, many of the factors that make up the "history and characteristics" of the defendant were either rejected or precluded, in favor of unyielding application of the guidelines.

At least one important directive of *Booker/Fanfan* is that courts may no longer uncritically apply the guidelines without regard to the express statutory mandate of 18 U.S.C. § 3553(a). The remedial majority in *Booker/Fanfan* unequivocally directs courts to consider **all** the factors in § 3553(a). Thus, the statutory directive under § 3553(a)(1) that a court consider the "history and characteristics of the defendant" takes on new meaning in light of *Booker/Fanfan*. Thus, for example, the Guidelines prohibited consideration of a defendant's age, *see* U.S.S.G. § 5H1.1; his education and vocational skills, *see* § 5H1.2; his mental and emotional condition, *see* § 5H1.3; his physical condition, including drug or alcohol dependence, *see* § 5H1.4; his employment record, *see* § 5H1.5; his family ties and responsibilities, *see* § 5H1.6; his socio-economic status, *see* § 5H1.10; his civic and military contributions, *see* § 5H1.11; and his lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing, *see* § 5H1.12. In discharging its sentencing responsibility today, this Court is clearly at liberty to consider all of these factors, and more. We respectfully submit that some, if not all, of these factors bear upon and need to be considered in assessing an appropriate sentence for Ms. Jisel Cordero.

*Sentencing Factors Under 18 U.S.C. § 3553*

Of course, notwithstanding *Booker/Fanfan*, 18 U.S.C. § 3553 provides the statutory authority and framework for sentencing in federal court. *See* Sentencing Reform Act of 1984, Pub. L. No. 98-473, §§ 211, 98 Stat. 71987, 1989-90 (1984). In enacting the Sentencing Reform Act, Congress expressly stated that courts "shall impose a sentence sufficient, but not greater than necessary," to comply with the purposes of criminal sanctions. 18 U.S.C. § 3553(a). The Sentencing Reform Act explicitly delineates the purposes of

criminal sanctions.  Section 3551(a) provides that every defendant "shall be sentenced . . . so as to **achieve the purposes** set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable **in light of all the circumstances of the case**." (emphasis added).

*Sufficient But Not Greater Than Necessary*

As noted earlier, 18 U.S.C. § 3553(a) expressly provides for a sentence "not greater than necessary" to achieve the purposes of sentencing. *United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992)("the United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom") *cited in United States v. Blarek II*, 7 F. Supp 2d at 210. This statutory mandate takes on new meaning in light of *Booker/Fanfan* for the obvious reason that judges are now permitted to weigh factors previously prohibited in achieving a just sentence.  Perhaps more than any other factor in the statutory scheme of the Sentencing Reform Act, the goal of imposing a sentence "not greater than necessary" is synonymous with doing justice.

Thus, although mercy is seldom included on the list of "traditional" rationales for sentencing, both § 3553(a) and the Second Circuit recognize it as a legitimate consideration for this Court.  In the context of this case and this defendant, even assuming Probation's loss amount calculation, the Guidelines clearly permit this Court to sentence this defendant as requested herein.

A.     § 3553(a)(1): Offender Characteristics

This case represents Jisel Cordero's only encounter with the criminal justice system.  Ms. Cordero has lived on her own since the age of 14, working hard to survive and provide for her children.  She has maintained steady, albeit modest, employment.  At age twenty-five Jisel Cordero has already devoted her adult life to providing for her two young children – and, importantly, in her absence, there is no safety-net for these children.  Thus, the impact of any

incarceration for her deeds will be mostly suffered by her young children. We respectfully submit that, given the totality of offender's characteristics, imprisonment would further no sentencing goal.

### B. § 3553(a)(2): The Purposes of Sentencing

Subparagraphs (A) through (D) of 18 U.S.C. § 3553(a)(2) instruct courts to consider the necessity of the sentence imposed: (i) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (ii) to afford adequate deterrence to criminal conduct; (iii) to protect the public from further crimes of the defendant; and (iv) to provide the defendant with needed educational or vocational training, medical care, or other, correctional treatment in the most effective manner. 18 U.S.C. §§ 3553(a)(2)(A)-(D). *See, generally, United States v. Blareck II*, 7 F.Supp.2d 192 (E.D.N.Y. 1998). None of these goals would be furthered by the incarceration of Jisel Cordero. Indeed, a jail sentence would subvert these goals by undermining her ability to protect and care for her children as well as ensuring the health of her unborn child. We respectfully submit that the purposes of sentencing as outlined in § 3553(A)(2)(A)-(D) would not be furthered by the incarceration of this defendant.

*§ 3553(a)(2)(A): The Seriousness of the Offense,*
*Respect for the Law, and Just Punishment*

The concepts embodied in § 3553(a)(2)(A) are interrelated and necessarily vary from case to case, depending on the nature of the offense, the underlying facts, and the defendant. There can be no more difficult task than the assessment of what constitutes a "just" sentence in any given case. Similarly, there can be no doubt of the limited and circumscribed nature of Jisel Cordero's participation in bank fraud charged.

As recently noted by Judge Sifton, "A 'just punishment' must also take into account the cost of the defendant's criminal conduct and the cost society must undertake to punish for the offense." *United States v. Simon*, 361 F.Supp.2d 35 (E.D.N.Y. 2005). The notion of the "cost" that society may bear to "punish" the individual necessarily includes the cost to society of the family displaced, or compromised, by incarceration of a defendant – particularly the mother of two young children. Certainly, the long-term benefits of Jisel Cordero as a supportive mother, helping her children (ages seven and 1-year old), well outweigh any short-term benefit of a *de minimus* period of incarceration.

*§ 3553(a)(2)(B) and 3553(a)(2)(C): General and Specific Deterrence*

Section 3553(a)(2)(B) instructs this Court to consider "the need for the sentence imposed" to afford "adequate deterrence to criminal conduct." Deterrence, however, must be seen in light of the mandate of § 3553(a) that a sentence not be "greater than necessary." The concept of general deterrence, like the concept of a "just sentence," is necessarily not subject to precise definition. We submit that a consideration of specific deterrence requires an appraisal of: (i) the nature of Jisel Cordero's specific criminality (particularly her limited knowledge of the fraud); (ii) the paucity of prior criminal history; (iii) the stage where she is in her life (the mother of two very young children); and (iv) the aberrant nature of her criminality, in the context of her life.

Clearly Jisel Cordero has no history of anti-social behavior, is the mother of tho children whom she supports, and has a history of employment. We respectfully submit that in the case of Jisel Cordero the need for incarceration as a means of instilling specific deterrence is non-existent. Deterrence (both general and specific) will be better and more effectively served by keeping her with her children, rather than incarcerating her, through supervision.

9

*§ 3553(a)(2)(D): Provision of Educational or Vocational Training*

Section 3553(a)(2)(D) requires this Court to consider the need to provide the defendant educational or vocational training, medical care, or other correctional treatment in the "most effective manner." Thus, rehabilitation and the improvement of the defendant are express goals of sentencing. *See Harmelin v. Michigan,* 501 U.S. 957, 999 (1991); and *United States v. Giraldo*, 822 F.2d 205, 210 (2d Cir.), *cert. denied*, 484 U.S. 969 (1987). Rehabilitation is designed to instill "in the offender proper values and attitudes, by bolstering respect for himself and institutions, and by providing [] the means of leading a productive life." *See* Charles E. Torcia, 1 *Wharton's Criminal Law,* § 18 (15th ed. 1993).

In the context of the life of Jisel Cordero, the provision of educational and vocational training does not justify a sentence of incarceration. Rather, incarceration would exacerbate the already tenuous family circumstances by precluding Jisel Cordero from providing for her children and instilling in them the lesson she has learned at so high a price.

*§ 3553(a)(3): The Kinds of Sentences Available*

As noted, *supra*, even assuming the Guidelines calculation presented by Probation, in Zone B the Guidelines permit this Court to structure a sentence devoid of incarceration. Moreover, the Guidelines are no longer mandatory, permitting this Court to fashion a sentence in light of the factors enumerated in § 3553(a).

D.    *§ 3553(a)(4) & § 3553(a)(5): The Advisory Guidelines*

Although the Guidelines are now advisory, we recognize the Court's obligation to consult and address the applicable Guidelines sentence. As we have noted, even accepting Probation's view of the loss calculation under the Guidelines (and we assume the government concurs with Probation) the Court has

broad discretion. Because we are loathe to unnecessarily the Court burden with factual and legal arguments – given that the Court can arrive at what we recommend is a reasonable sentence without such arguments – we will not fully expound all the sentencing avenues available to the Court. We respectfully point out, however, that to the extent the Court deems it necessary, the Court has available bases for a departure for family circumstances, as well as aberrant behavior.[1]

Of course, the facts supporting the departures described herein are also appropriate for consideration under the factors enumerated in 18 U.S.C. § 3553(a).

### E. § 3553(a)(6): Avoiding Sentencing Disparity Among Similarly Situated Defendants

The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, is expressly recognized in the SentencingReform Act. In the instant case that goal plays no significant role.

---

[1] Section 5K2.20 of the Guidelines expressly permits a departure from the applicable guidelines where a defendant's criminal conduct constituted aberrant behavior. Of course, it is within the sentencing court's sound discretion to downwardly depart from the applicable guideline range based on the aberrant nature of the defendant's behavior. *Zecevic v. United States Parole Commission,* 163 F.3d 731, 737 (2d Cir. 1998); *see also United States v. Grandmaison*, 77 F.3d 555, 563 (1st Cir. 1996); *United States v. Jones*, 158 F.3d 492, 500 (10th Cir. 1998); *United States v. Iaconetti*, 59 F. Supp. 2d 139 (Mass. Dist. Ct. July 7, 1999). The application notes to § 5K2.20 provide additional guidance for courts considering whether to grant a downward departure based on aberrant behavior. Courts may consider a defendant's mental and emotional condition, her employment record, her record of prior good works, the motivation for committing the offense, and efforts to mitigate the effects of the offense. *See* U.S.S.G. §5K2.20, comment n.2. The Guidelines, § 5K2.0, provide that it is within this Court's discretion to "impose a sentence outside of the range established by the applicable guidelines," if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." *See* United States Sentencing Commission, *Guidelines Manual*, § 5K2.0 (Nov. 2002); and *Koon v. United States,* 518 U.S. 81 (1996).

**V      SENTENCING RECOMMENDATION**

Jisel Cordero stands before the Court convicted of a misdemeanor, consistent with her limited agreement, participation and knowledge of the scheme she assisted. Consistent with the facts, the Guidelines permit this Court to sentence her in light of all the factors and arguments proffered herein. We implore the Court follow the recommendation of the Department of Probation in sentencing Jisel Cordero to a period of probation. Further, given her precarious financial position, we request the Court impose a nominal restitution schedule that will not jeopardize her ability to provide for her children.

I thank the Court for its consideration of the issues presented herein.

*Respectfully Submitted,*

Francisco E. Celedonio, Esq.

cc: AUSA Randall Jackson